It is conceded by counsel that this action is not the proper form of proceeding to determine the title to an office; but, in view of the stipulation of the parties waiving all questions of form of procedure, and the public importance of a speedy disposition of the question presented, we have examined the case, and determined to affirm the order appealed from on the merits.

The order must be affirmed, with costs.    All concur.

---

## MURPHY v. SCHNITZPAN et al.

(Supreme Court, Special Term, Kings County.    January 5, 1896.)

JUSTICES OF THE PEACE—ABRIDGING TERM OF OFFICE.

Justices of the peace of the city of Brooklyn are "justices of inferior local courts," within Const. 1895, art. 12, § 3, providing that the terms of city officers holding office on January 1, 1895, which would expire in an even-numbered year, shall be abridged so as to expire with the close of the preceding year, but that such provision shall not apply to any judicial officer "except judges and justices of inferior local courts."

Action by Edward C. Murphy against William Schnitzpan and others to restrain defendants from interfering with plaintiff's exercise of the office of justice of the peace in the city of Brooklyn, plaintiff claiming that his term had not expired.    Injunction denied.

James Troy, M. L. Towns, and J. A. Wernberg, for plaintiff.
Horace Graves and Jacob Brenner, for defendants.

GAYNOR, J.    By statute, the city of Brooklyn is divided into judicial districts, with the requirement that a justice of the peace be elected in each district.    They are given the same jurisdiction within the city that justices of the peace of towns have.    Laws 1850, c. 102; Brooklyn Charter, tit. 21.    The term of office is four years, beginning and ending at May 1st.    The plaintiff was elected for the Third district at the general election in 1892, for a term to end at May 1, 1896.    Four months of the term, therefore, remain.    The defendant Schnitzpan was elected to succeed him at the last general election.    The new state constitution adopted in 1894 separated city elections (except in cities of a population below 50,000) from national and state elections, by requiring them to be held in odd-numbered years.    In order to conform terms of office to this system, it provided that all terms existing on January 1, 1895, which would expire thereafter in an even-numbered year, and not at the end thereof, were abridged so as to expire at the end of the preceding year.    Article 12, § 3.    This fits the plaintiff's case, and his term, thus abridged, expired with the year 1895, unless the proviso at the end of the section excepts the office of justice of the peace in Brooklyn; and this brings us to the exact point of the controversy.    That proviso is that the section does not apply "to elections of any judicial officer, except judges and justices of inferior local courts."    The plaintiff insists that, within the meaning of this language as used in the constitution, he was not a justice of an inferior local court.    He

bases this insistence upon the assertion that courts of justices of the peace of towns never came under that designation, and that, therefore, like courts in cities do not. It seems to me that this claim grows out of the error of supposing that this nomenclature in respect to minor courts was new to the constitution of this state. Under the colonial government, all judicial officers, beginning with justices of the peace, and going up to justices of the supreme court, were appointed, not elected; and this method continued under the state government until the constitution of 1846 went into effect. Street, Council Revision, pp. 22–69. The ordinance of 1691, establishing the colonial judicial system, names all the judicial officers in this scale, beginning with justices of the peace. Who doubts that, in contradistinction to the courts of general jurisdiction which it established, courts of justices of the peace were on appropriate occasion designated as "inferior" and "local"? for they were both, in fact. This designation of courts, viz. high courts, courts of general jurisdiction, inferior courts, local courts, and special courts, is natural and obvious, and of ancient use. Bac. Abr. "Courts"; 3 Bl. Comm. c. 4. The first state constitution, viz. that of 1777, left the colonial judicial system as it was. The next constitution, that of 1821, still left all judicial officers appointive. In 1826 a constitutional amendment was adopted which provided for the election of justices of the peace in towns. This was the first time in colony or state that any judicial office was elective. In the next constitution, viz. that of 1846, a substantially new judicial system was established, and all judicial offices fixed thereby were made elective; and this is the first of our constitutions which used the nomenclature now under consideration. After providing for the election of judges, from those of the court of appeals down to justices of the peace in towns, and prescribing their terms of office, it further provided as follows: "Inferior local courts of civil and criminal jurisdiction may be established by the legislature in cities." Article 6, § 14. The people of the state, having by this constitution taken unto themselves the establishing of courts, and required that all the judicial officers specifically named therein, including justices of the peace of towns, should be elected, expressed their permission to the legislature to establish "inferior local courts in cities," prescribing no restriction in respect of whether they should be elective or not. They established inferior local courts in the towns, viz. courts of justices of the peace, and left the legislature to provide inferior local courts for cities. Surely, no one thought this reference to inferior local courts for cities would thereafter exclude courts of justices of the peace from that designation, either in ordinary speech or in constitutional interpretation. In the amendment of the judiciary article of the constitution adopted in 1869 (article 6, § 19), the said provision for the establishing of inferior local courts by the legislature in cities was amended by dropping the word "cities," thus leaving it general, and it was incorporated in the same words in the present constitution (article 6, § 18).

There seems to me to be no foundation, either in the ordinary use

of words, or in the terminology and nomenclature of our successive constitutions, for the claim that courts of justices of the peace, either in towns, villages, or cities, do not come under the designation of "inferior local courts." They are such in fact; and those of the city of Brooklyn seem to have been judicially recognized as such within the meaning of the words as used in the constitution, though the precise point was not raised. Geraty v. Reid, 78 N. Y. 64; People v. Terry, 108 N. Y. 10, 14 N. E. 815. I find nothing pertinent to the question in the case of Wenzler v. People, 58 N. Y. 516, cited upon the argument. The prolonged discussion in that case was as to whether the legislature could provide for the appointment instead of the election of police justices in the city of New York, in view of the special requirement in the said judiciary article of 1869 (section 18) that "justices of the peace and district court justices shall be elected in the different cities of the state." An additional argument is found in the designation of "superior city courts" in the Code of Civil Procedure (section 263), as it existed when the constitution of 1894 was adopted, and also in the same designation in the said judiciary article of 1869; the inference being that all other local courts in cities should be designated inferior. I conclude that courts of justices of the peace in the city of Brooklyn are embraced in the designation of "inferior local courts" in section 3 of article 12 of the constitution (that being the article on cities), and that, therefore, the plaintiff's term was abridged so as to end with the year 1895.

In order to get a decision of the question involved, counsel for the defendant Schnitzpan, upon the argument, waived the question of whether an action to restrain the claimant of an office from interfering with the incumbent would lie. It only remains to say whether the injunction shall be continued against the police. They had no right to use force in the dispute between these rival claimants, nor by their presence to countenance or encourage it. That they did so to any extent is a dangerous sign. It is the duty of a court not to close its eyes to such occurrences. It is not the business of the police to meddle in such matters, or forcibly interfere with citizens except to arrest them for crime. The contrary has become all too common. The like is not permitted in any free government in the world, except in some of the large cities of this country, and it will not be tolerated there much longer. It is the "right" of any citizen to arrest any one, even though he be a policeman, whom he sees committing any criminal offense, or to arrest any one who has committed a crime of the grade of felony, though he did not see him commit it; and it is the "duty" of a policeman to do the same. Cr. Code, §§ 177, 183. A citizen has as much right to arrest even a policeman committing a criminal offense as a policeman has to arrest a citizen. If either make an arrest, he must take the person arrested before a magistrate. To be plain about it, as the citizens do not want to be doing police duty, they hire policemen for that purpose, but do not thereby make them their masters, nor give them any more right to interfere with individuals than they have themselves. If the police are advised that one of these claimants is

without any judicial authority, it would be quite enough for them to refuse to execute his warrants, or to bring any prisoner before him. However, as it was stipulated that the main question should be decided, there is not likely to be any further unlawful interference; and the motion to continue the injunction is denied.